Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Jennifer Abreu, Esq.
Michael Vanunu, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

                    Plaintiffs,

          -against-

SOORAJ POONAWALA, D.O., SOORAJ POONAWALA
M.D. (A Sole Proprietorship), GARY LANCE GRODY,
IRINA ZAYONTS, YURIY ZAYONTS, ALEX
PUZAITZER, CCCP EQUIPMENT, INC., AK BEST INC.,
TOP NOTCH WHOLESALE INC., ARTHUR GITLEVICH,
TM EQUITIES INC., MILAN NUS, LEAD CONSULTING
GROUP INC., LILIA LEBED A/K/A LILIIA VLADOV, and
JOHN DOE DEFENDANTS "1" through "10",

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No: 1:22-cv-03063
            (PKC)(VMS)

**Plaintiff Demands a Trial by
Jury**

## AMENDED COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"),

as and for their Amended Complaint against defendants Sooraj Poonawala, D.O. ("Poonawala"),

Sooraj Poonawala M.D. (A Sole Proprietorship) (the "Poonawala Practice"), Gary Lance Grody

("Grody"), Irina Zayonts ("I. Zayonts"), Yuriy Zayonts ("Y. Zayonts"), Alex Puzaitzer ("Puzaitzer"), CCCP Equipment, Inc. ("CCCP"), AK Best Inc. ("AK Best"), Top Notch Wholesale Inc. ("Top Notch"), Arthur Gitlevich ("Gitlevich"), TM Equities Inc. ("TM Equities"), Milan Nus ("Nus"), Lead Consulting Group Inc. ("Lead Consulting"), Lilia Lebed a/k/a Liliia Vladov ("Lebed"), and John Doe Defendants "1" through "10" (the "John Doe Defendants") (collectively, referred to as the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $667,000.00 that the Defendants have wrongfully obtained from GEICO, by submitting or causing to be submitted, thousands of fraudulent no-fault insurance charges seeking payment for medically unnecessary, experimental, excessive, and otherwise non-reimbursable healthcare services in the form of purported extracorporeal shockwave therapy ("ESWT"), transcranial doppler testing ("TCD"), and videonystamography testing ("VNG") (collectively, referred to as the "Fraudulent Services").  The Fraudulent Services were purportedly provided to New York automobile accident victims who were insured by GEICO ("Insureds").

2.      In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of approximately $1.6 million in pending no-fault insurance claims for the Fraudulent Services because:

>   (i)     the Fraudulent Services were allegedly provided by and billed through the Poonawala Practice, which is a medical "practice" not under the control and direction of Poonawala, but rather, was at all relevant times operated, managed and controlled by Grody, the Management Defendants (as defined below), and the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

>   (ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate

decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics (as defined below);

(iii)   the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)   the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that were purportedly provided to Insureds; and

(v)   the Fraudulent Services, to the extent provided at all, were not provided by Poonawala or any other licensed physician, but by persons who were unlicensed, and were neither directly supervised by Poonawala nor employed by him or the Poonawala Practice.

3.      Poonawala is a New York physician who purports to own and operate a medical "practice" under a sole proprietorship using multiple tax identification numbers (hereinafter, the "Poonawala Practice") (collectively, the "Poonawala Defendants"), and purports to have used that medical "practice" to provide the Fraudulent Services to Insureds and bill GEICO and other New York automobile insurers millions of dollars.  Poonawala agreed to falsely hold himself out as the owner of the Poonawala Practice knowing it would be used to fraudulently exploit the New York no-fault insurance system.

4.      In fact, the Poonawala Defendants, in combination with: (i) Grody; (ii)  I. Zayonts, Y. Zayonts, and Puzaitzer (collectively, the "Management Defendants"); and (iii) CCCP, AK Best, Top Notch, Gitlevich, TM Equities, Nus, Lead Consulting, and Lebed (collectively, the "Laundering Defendants"), engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone more than $2.5 million for the alleged performance of the Fraudulent Services at more than forty (40) separate locations in a period of less than five (5) months.

5.     Notably, more than 1,700 claim submissions were made to GEICO seeking payment of no-fault benefits for the Fraudulent Services, all of which represented that Poonawala was the legitimate owner of the Poonawala Practice, and that he allegedly performed all the Fraudulent Services. In truth, Poonawala performed none of the Fraudulent Services and did not legitimately own, operate, manage or control the Poonawala Practice.

6.     In or about 2021, Grody, Management Defendants, and the John Doe Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things: (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement; (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule; and (iii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

7.     In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established.  Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – service

required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

8.     The Defendants seized on these changes in the Fee Schedule (or lack thereof) to bill for ESWT and other Fraudulent Services performed en masse. Grody, the Management Defendants, and the John Doe Defendants, in association with the Laundering Defendants, concocted a fraudulent treatment and billing scheme pursuant to which:

(i)     unlicensed "technicians" would allegedly render the Fraudulent Services on an itinerant basis at a large number of multidisciplinary "clinics" located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics");

(ii)    unlicensed "technicians" would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services;

(iii)   the reports, documents and bills for thousands of dollars per patient per date of treatment would be submitted to New York automobile insurance companies, including GEICO, falsely representing that the Fraudulent Services were performed by a licensed physician and seeking payment for their performance;

(iv)    licensed physicians would be recruited to allow their names and licenses to be used and to allow medical "practices" to be formed and/or used for purposes of billing New York automobile insurers, including GEICO; and

(v)     the billing for the Fraudulent Services would be "funded" through companies and the advances paid by the "funding" companies would be paid to Grody, the Management Defendants, the Laundering Defendants, and the John Doe Defendants, as well as other unlicensed individuals and entities, as part of a money laundering aspect of the scheme designed to continue the scheme's operation and to profit from the fraudulent scheme.

9.     Critical to the success of the fraudulent scheme was the recruitment of a licensed physician because the intended billing was for medical services. Therefore, Grody, at the request of the Management Defendants, began to recruit physicians licensed to practice medicine in New York

to become involved in this widescale fraudulent scheme. In or about June 2021, Poonawala was ultimately recruited by Grody to "front" as the owner of a medical "practice" and undertake a fake remote "supervisor" position, which Poonawala willingly accepted in exchange for a periodic salary.

10.     The success of the fraudulent scheme required substantial coordination between the Defendants, and Grody was the primary conduit to coordinate the Defendants' actions. For example, Poonawala provided Grody with, among other things, (i) a copy of his medical license and signature; and (ii) a W-9 form for the Poonawala Practice and the associated tax identification numbers.

11.     Once the information was acquired, Grody sent the information to the Management Defendants who then used Poonawala's license and signature and the tax identification numbers associated with the Poonawala Practice to: (i) generate false and fraudulent documents, including NF-3 forms (i.e., bills), assignment of benefit ("AOB") forms, and medical records; and (ii) operate and control the Poonawala Practice as a fictional healthcare "practice" to serve as a vehicle through which millions of dollars of billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

12.     Because the Poonawala Practice was nothing more than a shell to hide the participation of Grody, the Management Defendants, and the John Doe Defendants, in the scheme, it was equally critical to the success of the fraudulent scheme for the Defendants to partner with New York collection attorneys who were willing to:

> (i)     purport to represent Poonawala and the Poonawala Practice without any meaningful dialogue or conversation with their purported "clients" regarding the legal retention;
>
> (ii)    arrange for or coordinate "funding" (i.e., financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers, in connection with the unlawful scheme, through companies that the attorney/law firms had relationships with;

> (iii) pursue payment and collection against GEICO and other New York automobile insurers by (a) knowingly submitting fraudulent bills to the insurers for the Fraudulent Services and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid as needed; and
>
> (iv) accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to the funding companies or third parties.

13. To fulfill this role, the Defendants partnered with (i) Korsunskiy Legal Group, L.L.C. and its owner, Dennis Korsunskiy; and (ii) Law Offices of Akiva Ofshtein, P.C. and its owner, Akiva Ofshtein (collectively, the "Collection Lawyers").

14. In addition to arranging to have the Collection Lawyers represent Poonawala and the Poonawala Practice, Grody and the Management Defendants also arranged for the fraudulent claims to be funded through a series of companies associated with the Collection Lawyers, including EFAS Lending LLC ("EFAS Lending"), Big Bridge Funding LLC ("Big Bridge"), Ilko Capital Inc. ("Ilko"), Mazal Capital Inc. ("Mazal"), and AVL Capital LLC ("AVL") (collectively, the "Funders").

15. Grody and the Management Defendants used the information provided by Poonawala to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including the AOB forms and other medical records; (ii) the retainer agreement and/or engagement letter and associated documents needed by the Collection Lawyers to bill and collect on the Fraudulent Services; (iii) funding agreements to present to the Funders; and (iv) the directives that permitted the Collection Lawyers to transfer the money received from the insurance companies, including GEICO, to the funding companies or third parties.

16. Once the documents were all in place, (i) Grody and the Management Defendants transferred the claim documents to the Funders and the Collection Lawyers; and (ii) the Funders

began transferring money as "advances" against the claims for the Fraudulent Services, so that the payments could be used for the benefit of Grody and the Management Defendants as well as to pay other unlicensed individuals and entities to perpetuate their fraudulent scheme.

17.     To facilitate the fraudulent scheme, Grody, the Management Defendants and the John Doe Defendants used a series of shell companies to conceal their identities and involvement, launder the profits of the scheme to themselves, and funnel money to other unlicensed laypersons to pay expenses that fund the scheme, including payments to access the Clinics.

18.     As discussed herein, herein, the Defendants, at all relevant times, have known that:

(i)     the Fraudulent Services were allegedly provided by and billed through the Poonawala Practice, which was unlawfully operated, managed, and controlled by Grody, the Management Defendants, and the John Doe Defendants rather than Poonawala, for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

(ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics;

(iii)   Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)    the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that were purportedly provided to Insureds; and

(v)     the Fraudulent Services, to the extent provided at all, were not provided by Poonawala or any other licensed physician, but by persons who were unlicensed, and were neither directly supervised by Poonawala nor employed by him or the Poonawala Practice.

19.     The Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed or caused to be billed to GEICO.

20.     The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that the Defendants submitted, or caused to be submitted, to GEICO.

21.     The Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on unpaid charges for the Fraudulent Services.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $667,000.00.

**THE PARTIES**

**I.     Plaintiffs**

22.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.    Defendants**

23.     Defendant Poonawala resides in and is a citizen of New York. Poonawala is a physician licensed to practice medicine and agreed to the formation of the Poonawala Practice and to "front" as its owner while allowing Grody and the Management Defendants to use his license and the Poonawala Practice as a "vehicle" to submit fraudulent claims to GEICO and other New York automobile insurers. At all relevant times, Poonawala purported to provide the Fraudulent Services that were billed to GEICO through the Poonawala Practice.

24.     The Poonawala Practice is a New York sole proprietorship with its principal place of business in New York.

25.     Defendant I. Zayonts resides in and is a citizen of New York.  I. Zayonts is not and has never been a licensed healthcare professional. At all relevant times, I. Zayonts secretly and

unlawfully owned, operated, managed and controlled the Poonawala Practice, along with the other Management Defendants and Grody, by virtue of the control she exercised over the Poonawala Practice's operations and profits, as well as the services provided to Insureds at the Clinics.

26.     Defendants Y. Zayonts resides in and is a citizen of New York. Y. Zayonts is not and has never been a licensed healthcare professional. At all relevant times, Y. Zayonts secretly and unlawfully owned, operated, managed and controlled the Poonawala Practice, along with the other Management Defendants and Grody, by virtue of the control he exercised over the Poonawala Practice's operations and profits, as well as the services provided to Insureds at the Clinics.

27.     Defendant Puzaitzer resides in and is a citizen of New York. Puzaitzer is not and has never been a licensed healthcare professional. At all relevant times, Puzaitzer secretly and unlawfully owned, operated, managed and controlled the Poonawala Practice, along with the other Management Defendants and Grody, by virtue of the control he exercised over the Poonawala Practice's operations and profits, as well as the services provided to Insureds at the Clinics.

28.     Defendant Grody resides in and is a citizen of New York. Grody is not a licensed healthcare professional. At all relevant times, Grody secretly and unlawfully owned, operated, managed and controlled the Poonawala Practice, along with the Management Defendants, by virtue of the control he exercised over the Poonawala Practice's operations and profits, as well as the services provided to Insureds at the Clinics.

29.     Defendant CCCP is a New York corporation with its principal place of business in New York. CCCP was formed on or about June 23, 2021 and is owned by Gitlevich.

30.     Defendant AK Best is a Pennsylvania corporation formed on or about June 2, 2019 and is owned by Gitlevich. At all relevant times, AK Best transacted business within New York,

has regularly done business in New York, engaged in a persistent course of conduct in New York and derived revenue from the alleged performance of the Fraudulent Services in New York.

31.     Defendant Top Notch is a Pennsylvania corporation formed on or about April 19, 2021 and is owned by Gitlevich. At all relevant times, Top Notch transacted business within New York, has regularly done business in New York, engaged in a persistent course of conduct in New York and derived revenue from the alleged performance of the Fraudulent Services in New York.

32.     Defendant Gitlevich resides in and is a citizen of Pennsylvania.  Gitlevich is not and has never been a licensed healthcare professional. At all relevant times, Gitlevich has transacted business within New York, has regularly done business in New York, engaged in persistent course of conduct in New York and derived substantial revenue from the alleged performance of the Fraudulent Services in New York. Specifically, Gitlevich used his entities CCCP, AK Best and Top Notch – to conceal his identity and involvement in and unlawfully profit from the fraudulent scheme.

33.     Defendant TM Equities is a Florida corporation formed on or about August 27, 2021. TM Equities is owned on paper by a woman by the name of Tatyana Chaussky but is in actually owned and controlled by Nus.  At all relevant times, TM Equities transacted business within New York, has regularly done business in New York, engaged in a persistent course of conduct in New York and derived revenue from the alleged performance of the Fraudulent Services in New York

34.     Defendant Nus resides and is a citizen of New Jersey.  Nus is not and has never been a licensed healthcare professional. At all relevant times, Nus has transacted business within New York, has regularly done business in New York, engaged in persistent course of conduct in New York and derived substantial revenue from the alleged performance of the Fraudulent

Services in New York. Specifically, Nus used TM Equities to conceal his identity and involvement in and unlawfully profit from the fraudulent scheme.

35. Defendant Lead Consulting is a New York corporation with its principal place of business in New York. Lead Consulting was formed on or about October 2, 2017 and is owned by Lebed.

36. Defendant Lebed resides in and is a citizen of New York. Lebed is not and has never been a licensed healthcare professional. At all relevant times, Lebed used Lead Consulting to derive substantial revenue from the alleged performance of the Fraudulent Services in New York. Specifically, Lebed used Lead Consulting to conceal her identity and involvement in and unlawfully profit from the fraudulent scheme.

37. John Doe Defendants are citizens of New York and reside in the Eastern District of New York. John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Defendants by: (i) unlawfully owning, profiting, operating, managing and/or controlling the Poonawala Practice; (ii) providing the Defendants with access to the patients at the Clinics; (iii) creating and/or collecting the no-fault claims (i.e., the paperwork) for the Fraudulent Services; (iv) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers, including the Collection Lawyers; and/or (v) coordinating with Grody, the Management Defendants and Laundering Defendants on how to launder and clean virtually all of Poonawala Practice's profits.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §

1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive

of interests and costs, and is between citizens of different states.

39.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought

under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO")

Act, because they arise under the laws of the United States. In addition, this Court has supplemental

jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. §

1367.

40.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern

District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint

occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

41.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of Pertinent Law Governing No-Fault Reimbursement

42.     New York's no-fault laws are designed to ensure that injured victims of motor

vehicle accidents have an efficient mechanism to pay for and receive the health care services that

they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y.

Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§

65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to

provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

43.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

44.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

45.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").   In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

46.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

47.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….   (Emphasis added).

48.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

49.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

50.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

51.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

52.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

53.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

54.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or

his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

55.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

56.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

57.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

58.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Defendants' Fraudulent Scheme

### A.     Poonawala and His Recruitment

59.     Poonawala is a Doctor of Osteopathic Medicine and became licensed to practice medicine in New York in 2019.  Defendant Poonawala is employed as a physician at New York Presbyterian Lawrence Hospital in Bronxville, New York and ProHealth Urgent Care in the NYC metropolitan area.

60.     The success of the fraudulent scheme required a licensed physician because of the nature of the Fraudulent Services for which Grody, the Management Defendants and the John Doe Defendants intended to bill GEICO and other New York automobile insurers.

61.     Therefore, in or about June 2021, Grody recruited Poonawala to participate in the fraudulent scheme. In accepting Grody's offer to work with him, Poonawala agreed to associate with Grody and others and to falsely hold himself out as the legitimate owner of the Poonawala Practice knowing it would be used to commit fraud.

62.     Based on the arrangement, Poonawala would receive a periodic salary in exchange for allowing his name, license and the tax identification numbers associated with the Poonawala Practice to be used and would also contend that he "supervised" the Fraudulent Services if any insurance company ever inquired.

63.     In connection with the bogus supervisor position, Grody had Poonawala sign an "employment" agreement with a fictitious company called Integrated Health Systems and provide him with (i) a copy of his New York medical license, (ii) a copy of his signature, and (iii) a W-9

form for the Poonawala Practice that contained Poonawala's signature and tax identification for the entity.

64.     Poonawala was aware that the "supervisor" position with Grody was a sham, and that the "position" entailed no actual supervisory duties.  In fact, Poonawala did not hire, employ, supervise, or even know the names of any technician that purportedly rendered the Fraudulent Services billed through the Poonawala Practice.

65.     Once Grody acquired Poonawala's license number, signature, and the tax identification numbers of the Poonawala Practice, Grody forwarded the information and signature to the Management Defendants who then used the information and signature to set up the operational and financial framework of the fraudulent scheme, including generating the various documents that were necessary to implement the scheme.

66.     Shortly thereafter, Poonawala was requested by Grody to open a bank account for the Poonawala Practice and to add him as a signatory to the account.  In response, and in furtherance of the fraudulent scheme, Poonawala opened a TD bank account and added Grody as a signatory (hereinafter, the "Grody Joint Account"), thereby, allowing Grody and the Management Defendants to exercise complete control over the Poonawala Practice's finances and operations.

67.     At or around the same time, Poonawala signed at Grody's request (i) agreements with all the Funders, (ii) a retainer agreement and/or a letter of representation with the Collection Lawyers; (iii) directives that permitted the Collection Lawyers to control the flow of money related to insurance payments realized from the fraudulent scheme; and (iv) statements authorizing the use of his electronic signature for billing and funding purposes.

68.     Beginning in June 2021, the Defendants used Poonawala's name, license and social security number as well as the tax identification number of the Poonawala Practice to effectuate the fraudulent scheme.

**B.     Grody and the Management Defendants**

69.     The complex fraudulent scheme perpetrated against GEICO and other New York automobile insurers originated with Grody and the Management Defendants, each of whom has a history of involvement in various types of unlawful fraud schemes.

70.     In or around early 2021, Grody and the Management Defendants associated and then recruited and combined with the other Defendants to invent and implement the scheme described herein.

71.     Grody, who holds himself out to the public to be a licensed clinical psychologist, is, in fact, a convicted felon who is not licensed to practice psychology or any other form of healthcare in New York.

72.     For the past twenty (20) years, Grody's involvement in the healthcare field has been limited to the fraudulent use of various healthcare practices as part of multiple schemes – including the one described in this complaint – which have been designed by Grody and others to manipulate New York's no-fault system to defraud insurance companies for the financial benefit of Grody and of those with whom Grody associates.

73.     Grody has been forced to operate in the "shadows" of the healthcare industry because of his past criminal and civil problems.

74.     In 2002, Grody was indicted in the Eastern District of New York and ultimately pleaded guilty in 2003 to three (3) separate counts in connection with an insurance fraud scheme that resulted in him: (i) being imprisoned for more than a year and serving a supervised release for

a period of three years; and (ii) paying restitution to Allstate Insurance Company of more than $280,000.00.

75.     Shortly after he was released from prison, Grody engaged in multiple additional fraudulent insurance schemes, which resulted in at least four (4) major automobile insurance companies filing a series of civil recovery actions against him and various others, with more than $10 million in judgments ultimately being entered against him.

76.     Upon information and belief, those judgments remain unsatisfied, and Grody remains incapable of legitimately operating within the healthcare industry, thereby contributing to his motive to engage in the fraudulent conduct described herein.

77.     The Management Defendants have similar problems operating with the New York No-Fault industry because of their history.

78.     For example, in 2012, Y. Zayonts and I. Zayonts were both indicted in the Southern District of New York in connection with a $300,000,000.00 no-fault insurance fraud scheme. Both pleaded guilty to various counts in 2014, resulting in (i) Y. Zayonts being sentenced to twenty-four (24) months in federal prison, three (3) years of supervised release and an order directing that payment of more than $360,000 in restitution to more than twenty-five (25) automobile insurance companies, including GEICO, and (i) I. Zayonts being sentenced to two (2) years' probation.

79.     Additionally, in 2013, Puzaitzer was indicted in the Southern District of New York in connection with a fourteen-year long securities fraud scheme, and in 2014, pleaded guilty to various counts, resulting in him being sentenced to twenty-eight (28) months in federal prison, three (3) years of supervised release, and an order directing the payment of $400,000.00 in restitution to the United States government.

C.      **The Funding Relationships and the Money Laundering Scheme**

80.     Once the Management Defendants were provided by Grody with Poonawala's license, signature, and the tax identification numbers of the Poonawala Practice, they used the information to arrange for "funding" agreements between the Poonawala Practice and various companies, including EFAS Lending, Big Bridge, Ilko, Mazal, and AVL i.e., the Funders.

81.     The purpose of the funding agreements was to create the appearance that there were legitimate financing or factoring agreements associated with the fraudulent billing when, in fact, the true purpose was to allow Grody, the Management Defendants and other Defendants to get paid up front.  In fact, the fraudulent funding agreements allowed the funding companies such as EFAS Lending, Big Bridge, Ilko, Mazal, and AVL to charge exorbitant interest rates and other fees against the "advances" that were to be made against the fraudulent billing as a financial reward for the risk that they were taking to fund the fraudulent scheme and pay the advances to Grody, the Management Defendants, and others, rather than to Poonawala or the Poonawala Practice.

82.     In contrast to legitimate funding relationships, where the money advanced against the billing is actually paid to the healthcare provider (i.e., the Poonawala Practice in this case), Grody and the Management Defendants arranged for the "advances" to be paid to themselves and to other third parties having no legitimate or identifiable relationship to Poonawala or the Poonawala Practice.

83.     For example, GEICO has identified large amounts of payments that were funneled to Grody and the Management Defendants, in connection with the "advances" by the Funders, including:

> (i)     Payments by AVL to Grody through a shell company he owns, Margot Consulting Enterprises, LLC, totaling about $25,000.00;

(ii)    Payments by the Funders to the Grody Joint Account and then redirected by Grody to various shell companies Grody owns, including Oliver Consulting LLC and Linzian Consulting Inc., totaling more than $136,000.00; and

(iii)    Payments by the Funders to the Grody Joint Account and then redirected by Grody to a shell company Y. Zayonts owns, LYZ Services Inc., totaling about $75,000.00.

84.    The "advances" made were used by Grody and the Management Defendants for their own benefit and to generate the cash or other funds needed to operate and maintain the fraudulent scheme, including kickbacks paid to the Clinics.

85.    Notably, the flow of funds between the Defendants illustrates a money laundering scheme. Specifically, the Defendants used a series of shell companies, including CCCP, AK Best, Top Notch, TM Equities and Lead Consulting, to (i) launder the "advances" paid in connection to the performance of the Fraudulent Services; and (ii) allow unlicensed laypersons to profit from their participation in the fraudulent scheme while hiding their identities and involvement.

86.    For example, GEICO has identified the following substantial payments to the Laundering Defendants, in connection with the "advances" by the funding companies:

(i)    Payments by Grody from the Grody Joint Account to Gitlevich through shell companies he owns, including CCCP, AK Best and Top Notch, totaling more than $650,000.00;

(ii)    Payments by Grody from the Grody Joint Account to Nus through a shell company he owns, TM Equities, totaling about $220,000.00;

(iii)    Payments by Grody from the Grody Joint Account to Lebed through a shell company she owns, Lead Consulting, totaling more than $120,000.00.

87.    The advances were a critical part to the success of the fraudulent scheme because: (i) Grody and the Management Defendants were able to realize an immediate financial benefit and fund the fraudulent scheme because they were paid a percentage on the face value of the billings that were submitted to automobile insurers, including GEICO, for the Fraudulent Services without

any individual risk because they were not signatory to the funding agreements; and (ii) the advances (a) provided the necessary cash needed to establish and maintain the illegal relationships with the Clinics in order to gain access to Insureds for purposes of providing the Fraudulent Services, and (b) gave the Defendants the ability to hide from automobile insurers such as GEICO the flow of funds that was needed to operate the fraudulent scheme and financially benefit and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

88.     The fraudulent funding arrangements and the money laundering aspect of the scheme implemented by Grody, the Management Defendants, the Funding Defendants, the Laundering Defendants, and the John Doe Defendants was designed to hide from New York automobile insurers their participation and control over the Poonawala Practice and the existence of the illegal financial arrangements between the Defendants and other individuals who owned and/or managed the Clinics.

**D.     Gaining Access to Insureds and the Unlicensed Technicians**

89.     In order for the scheme to succeed, Grody and the Management Defendants needed to obtain access to a large volume of Insureds on whom the Fraudulent Services could be provided.

90.     The Poonawala Practice had no legitimate indicia. It had no fixed treatment locations of any kind, did not maintain a stand-alone practice, was not the owner or leaseholder in any of the real property from which it purported to provide the Fraudulent Services, did not employ its own support staff, and did not advertise or market its services to the general public.

91.     Therefore, to obtain access to the Clinics' patient base (i.e., the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported

to be treated, at the Clinics.  Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

92.     Grody and the Management Defendants accelerated the fraudulent scheme by using the name of Poonawala and the Poonawala Practice on an itinerant basis in connection with the performance of the Fraudulent Services from more than forty (40) separate Clinics, primarily located in Brooklyn, Queens, and Bronx, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangement, including the following:

- 60 Belmont Avenue, Brooklyn, New York
- 146 Empire Boulevard, Brooklyn, New York
- 1975 Linden Boulevard, Elmont, New York
- 1894 Eastchester Road, Bronx, New York
- 108 Kenilworth Place, Brooklyn, New York
- 30 South Central Avenue, Valley Stream, New York
- 82-17 Woodhaven Boulevard, Queens New York
- 1655 Richmond Avenue, Staten Island, New York
- 69-37 Myrtle Avenue, Glendale, New York
- 1120 Morris Park Avenue, Bronx, New York
- 180-09 Jamaica Avenue, Jamaica, New York
- 3432 East Tremont Avenue, Bronx, New York
- 3910 Church Avenue, Brooklyn, New York
- 3626 East Tremont Avenue, Bronx, New York
- 92-07 Roosevelt Avenue, Queens, New York
- 87-15 115th Street, Richmond Hill, New York
- 137-42 Guy R. Brewer Boulevard, Queens, New York
- 632 Utica Avenue, Brooklyn, New York
- 170-04 Henley Road, Queens, New York
- 219 Hempstead Turnpike, West Hempstead, New York
- 611 East 76th Street, Brooklyn, New York
- 550 Remsen Avenue, Brooklyn, New York
- 3626 Bailey Avenue, Bronx, New York
- 176 Wilson Avenue, Brooklyn, New York
- 2386 Jerome Avenue, Bronx, New York
- 160-59 Rockaway Boulevard, Queens, New York
- 3027 Avenue V, Brooklyn, New York
- 615 Seneca Avenue, Ridgewood, New York
- 9801 Foster Avenue, Brooklyn New York

- 14 Bruckner Boulevard, Bronx, New York
- 102-34 Atlantic Avenue, Ozone Park, New York
- 97-01 101st Avenue, Ozone Park, New York
- 92-08 Jamaica Avenue, Woodhaven, New York
- 1650 Eastern Parkway, Brooklyn, New York
- 3407 White Plains Road, Bronx, New York
- 1647 Macombs Road, Bronx, New York
- 3060 East Tremont Avenue, Bronx, New York
- 9809 Foster Avenue, Brooklyn, New York.

93.     The Clinics provided facilities for the Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

94.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

95.     For example:

(i)     GEICO has received billing for purported healthcare services rendered at the clinic located at 615 Seneca Avenue, Queens, New York from a "revolving door" of more than 100 different purported healthcare providers. Additionally, GEICO has received billing for purported healthcare services rendered at the clinic located at 550 Remsen Avenue, Brooklyn, New York from a "revolving door" of more than 100 different purported healthcare providers.

(ii)    GEICO has received billing for purported healthcare services rendered at the clinic located at 632 Utica Avenue, Brooklyn, New York from a "revolving door" of more than 100 different purported healthcare providers.

(iii)    GEICO has received billing for purported healthcare services rendered at the clinic located at 60 Belmont Avenue, Brooklyn, New York from a "revolving door" of more than 100 different purported healthcare providers.

(iv)    GEICO has received billing for purported healthcare services rendered at the clinic located at 1975 Linden Boulevard, Brooklyn, New York from a "revolving door" of more than 100 different purported healthcare providers.

(v)     GEICO has received billing for purported healthcare services rendered at the clinic located at 1120 Morris Park Avenue, Bronx, New York from a "revolving door" of more than 100 different purported healthcare providers.

(vi)    GEICO has received billing for purported healthcare services rendered at the clinic located at 180-09 Jamaica Avenue, Jamaica, New York from a "revolving door" of more than 80 different purported healthcare providers.

(vii)   GEICO has received billing for purported healthcare services rendered at the clinic located at 146 Empire Boulevard, Brooklyn, New York from a "revolving door" of more than 75 different purported healthcare providers.

(viii)  GEICO has received billing for purported healthcare services rendered at the clinic located at 108 Kenilworth Place, Brooklyn, New York from a "revolving door" of more than 70 different purported healthcare providers.

(ix)    GEICO has received billing for purported healthcare services rendered at the clinic located at 1650 Eastern Parkway Brooklyn, New York from a "revolving door" of more than 65 different purported healthcare providers.

(x)     GEICO has received billing for purported healthcare services rendered at the clinic located at 3027 Avenue V, Brooklyn, New York from a "revolving door" of more than 60 different purported healthcare providers.  GEICO has received billing for purported healthcare services rendered at the clinic located at 9801 Foster Avenue, Brooklyn, New York from a "revolving door" of more than 40 different purported healthcare providers.

(xi)    GEICO has received billing for purported healthcare services rendered at the clinic at 3910 Church Avenue, Brooklyn, New Yok from a "revolving door" of more than 75 different purported healthcare providers.

96.     In keeping with the fact that unlicensed laypersons controlled many of the Clinics and that the Defendants paid illegal kickbacks in exchange for patient referrals, several of the Clinics from which the Poonawala Practice purported to operate are identified in United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG) (S.D.N.Y.) ("USA v. Rose") as being controlled by laypersons and as receiving patients as a result of illegal kickback and referral

arrangements.  The Government affidavits unsealed in <u>USA v. Rose</u> include excerpts of wiretaps and other evidence indicating that, among dozens of other locations, patients were steered to the following layperson-controlled Clinics: (i) 8715 115th Street, Richmond Hill, and (ii) 69-37 Myrtle Avenue, Glendale, both locations where Poonawala and the Poonawala Practice purported to provide services to Insureds.

97.     Furthermore, many of the medical providers at the clinic located at 3910 Church Avenue, Brooklyn, New Yok (where Poonawala and the Poonawala Practice purported to provide services to Insureds) were named as defendants in a federal RICO action where GEICO credibly alleged that the location was owned and controlled by laypersons and the medical providers performed medically unnecessary services based on the improper financial (and other) relationships among the defendants and laypersons.  <u>See Government Employees Insurance Co., et al., v. East Flatbush Medical, P.C.</u>, et al., 20-CV-1695 (MKB)(PK).  In fact, in <u>East Flatbush</u>, a physician who worked at the 3910 Church Ave Clinic stated under oath that he ended his involvement with this clinic because of, among other things, (i) his concern about the manner in which patients were brought to the clinic; (ii) the manner in which the clinic was operated; (iii) the use of his signature stamp without his consent; and (iv) the submission of billing for services through his personal tax identification number without his consent.

98.     Clinics willingly provided access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to high volumes of Insureds at the locations.

99.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent".  They were in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement.

100.    Neither Poonawala nor the Poonawala Practice ever had a genuine doctor-patient relationship with the Insureds that visited the Clinics nor did the Insureds ever have any scheduled appointments.  The reason for this is because in connection with the "pay to play" arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

101.    In keeping with the fact that the Clinics controlled the patient base and that the Poonawala Practice was simply one of several interchangeable "cogs" in the fraud wheel, there were numerous instances during the almost five months in which it "operated" where the Poonawala Practice was: (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the Fraudulent Services on Insureds, and (ii) was one of numerous "providers" rendering the Fraudulent Services at specific Clinic locations in alternating weekly sequences.

102.    The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

103.    The unlawful kickback and referral arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant benefit from the relationships with the Clinics, because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

104.     Once all the necessary "pieces" were in place and Poonawala had turned control over to Grody and the Management Defendants, the fraud scheme was placed into overdrive.

105.     Grody and the Management Defendants began to illegally operate and manage the Poonawala Practice and implemented the fraudulent billing and treatment scheme using a "quick hit" strategy, billing GEICO and other New York automobile insurers millions of dollars for the performance of the Fraudulent Services in a matter of months, thereby attempting to limit the insurance companies' ability to investigate and address the scheme.

106.     In furtherance of the scheme, Grody and the Management Defendants recruited and hired unlicensed technicians to (i) provide the Fraudulent Services on behalf of the Poonawala Practice to Insureds at the Clinics and (ii) generate the necessary paperwork from the unlawful referrals.

107.     Grody and the Management Defendants also controlled the unlicensed technicians' schedules, arranged for them to appear at the controlled his schedule, and told them which Clinics to go to perform the Fraudulent Services.

108.     Poonawala did not hire, employ or supervise the unlicensed technicians. In fact, Poonawala never met or communicated with any of the unlicensed technicians that purportedly provided the Fraudulent Services.

109.     From July 2021 through November 2021 GEICO received through the United States Mail, bills, AOBs, and other records from the Defendants (through the Collection Lawyers) with respect to more than 1,700 bills involving more than 800 separate patients and seeking payment of more than $2.5 million.

110.     Once the Defendants' "quick hit" billing for the Fraudulent Services was accomplished over a period of less than five (5) months, the Defendants arranged to cease all

treatment activity, shuttered the Poonawala Practice without explanation, continuing only to retain law firms to pursue collection of the fraudulent charges from GEICO and other insurers, which continues to this day.

**E.    The Fraudulent Billing and Treatment Protocols Employed by The Defendants**

111.    The Fraudulent Services billed in the name of the Poonawala Practice were not medically necessary and were provided, to the extent they were provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.  The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

112.    Neither Poonawala nor any other licensed physicians were ever involved in the performance of the Fraudulent Services.   In fact, unlicensed laypersons, rather than any healthcare professionals working at the Clinics, developed and controlled the patient base at the Clinics and the resulting referrals.

113.    Once they were given access, Grody and the Management Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services and subject them to services that were unnecessary, experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

114.    Grody and the Management Defendants also arranged to have the individuals operating the No-Fault Clinics generate stamped reports in the name of other healthcare providers (the "Referring Providers") that were generic, preprinted, and boilerplate for the purposes of justifying the performance of the Fraudulent Services.

115.    In keeping with the fact that the Fraudulent Services were supported by false justification, the documents stamped with the name of the Referring Providers often failed to document whether the Insured referred for the Fraudulent Services exhibited any of the conditions that would necessitate performance of the Fraudulent Services.

116.    In fact, there was no physician involvement with the performance of any of the Fraudulent Services, and the only point in having the Insureds seen by the unlicensed technicians was to get the patient's signature on a piece of paper so that Grody and the Management Defendants could get money from the Funders and transmit the claims to the Collection Lawyers so that they could generate bills and submit them to GEICO seeking payment for the Fraudulent Services to earn their compensation.

117.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

118.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

119.    No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

### 1.    The Fraudulent Charges for "Extracorporeal Shockwave Therapy"

120.    As part of the fraudulent scheme, Insureds were subjected medically unnecessary ESWT "treatments".  In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement and that the Poonawala Practice was just one of several billing entities being used, Grody and the Management Defendants arranged to have the services documented on a generic "form" that intentionally avoided referencing Poonawala or the Poonawala Practice.

121.    The following is a representative example:



**ESWT PROGRESS THERAPY NOTES**

Extracorporeal shock wave therapy (ESWT) is a noninvasive method used to treat pain with shock or sound waves directed from outside the body onto the area to be treated, (e.g., the heel in the case of plantar fasciitis). Shock waves are generated at high- or low-energy intensity, and treatment protocols can include more than one treatment. ESWT has been investigated for use in a variety of musculoskeletal conditions.

Patient Name _____    Date of Service: _9/13/21_ .

Patient Signature X _____

| 1 Visit | 2 FUVisit | 3 FUVisit | 4 FUVisit | 5 FUVisit | 6 FUVisit | 7 FUVisit | 8 FUVisit | 9 FUVisit |
|---------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|
|         |           | ✓         |           |           |           |           |           |           |

| Cervical spine regions muscular pain | ☒ | | 0101T |
| Thoracic spine regions muscular pain | ☒ | | 0101T |
| Lumbar spine regions muscular pain | ☒ | | 0101T |
| Shoulder | ☐ Left ☐ Right | | 0101T |
| Elbow | ☐ Left ☐ Right | | 0101T |
| Wrist | ☐ Left ☐ Right | | 0101T |
| Hip | ☐ Left ☐ Right | | 0101T |
| Upper leg | ☐ Left ☐ Right | | 0101T |
| Lower leg | ☐ Left ☐ Right | | 0101T |
| Knee | ☐ Left ☐ Right | | 0101T |
| Ankle | ☐ Left ☐ Right | | 0101T |
| Feet | ☐ Left ☐ Right | | 0101T |
| Other | | | |

Total body part treated _3_

122.    Of consequence, the "notes" associated with the ESWT "treatments" never identified who actually performed the service, but the claims that were submitted to GEICO by the Collection Lawyers included an NF-3 form that falsely represented that Poonawala performed the actual service:

| PATIENT: | | | | DOA  07/17/21 | | PROVIDER FILE # | SPMD  236.01 | | |
|---|---|---|---|---|---|---|---|---|---|

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 2
14  WILL THE PATIENT REQUIRE REHABILITATION AND/OR OCCUPATIONAL THERAPY AS A RESULT OF THE INJURIES SUSTANED IN THIS ACCIDENT?

| YES | X | NO | | IF YES, describe your recommendation below | See Attached Materials |
|---|---|---|---|---|---|

15  REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING | ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES | | |
|---|---|---|---|---|---|---|---|
| 09/13/21 | Facility | 11203 | Cervical | 0101T | 1 | $699.98 | $699.98 |
| 09/13/21 | Facility | 11203 | Lumbar | 0101T | 1 | $699.98 | $699.98 |
| 09/13/21 | Facility | 11203 | Thoracic | 0101T | 1 | $699.98 | $699.98 |

| PLACE OF SERVICE ADDRESS | 632 Utica Ave, Brooklyn, NY 11203 | TOTAL CHARGES | $2,099.94 |
|---|---|---|---|

16  IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING

| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
|---|---|---|---|---|---|
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Sooraj Poonawala, MD | | 299186-01 | | | OWNER |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary)

Sooraj Poonawala, MD, Lic #299186-01

| 18  IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | YES | NO | X |
|---|---|---|---|

19  ESTIMATED DURATION OF FUTURE TREATMENT
        UNDETERMIINED

123.    As noted in the example above, once documented by the unidentified technicians, the Defendants then arranged to bill GEICO for the performance of ESWT using the tax

identification associated with the Poonawala Practice and using CPT code 0101T multiple times. The Defendants – through the Poonawala Practice – typically charged GEICO for three sessions of ESWT per Insured, resulting in a charge of $2,099.94 per Insured for each date of service.

124.    The following is the relevant section of the Fee Schedule

**CATEGORY III CODES**                                                                    **0042T–0504T**

**Medical Fee Schedule**                                                          **Effective April 1, 2019**

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

125.    As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.   Additionally, and as noted in the Fee Schedule, the CPT code (i) is scheduled to be paid using the conversion rate for surgical services, and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

126.    Furthermore, the ESWT allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons.   In the first instance, the charges were fraudulent in that the

unlicensed technicians controlled by Grody and the Management Defendants did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T.  Rather, Grody and the Management Defendants arranged to have the unlicensed technicians perform Radial Pressure Wave Therapy on the Insureds.  Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.  Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.  In fact, Grody and the Management Defendants arranged to have the unlicensed technicians utilize a portable, compact radial wave pressure device that does not even purport to be able to provide the high energy capacity necessary to produce a true shock wave.

127.    Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain, and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

128.    In keeping with the fact that ESWT for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i) Aetna insurance company considers ESWT experimental and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (ii) UnitedHealth Group Incorporated

care does not cover ESWT for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iii) the Blue Cross Blue Shield Association does not cover ESWT for the treatment of musculoskeletal conditions because it is considered investigational; and (iv) Cigna considers ESWT experimental, investigational, or unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

129.    Notwithstanding the experimental nature, Grody and the Management Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation.  In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.  Notwithstanding this, in many cases, Grody and the Management Defendants purported to provide ESWT treatments to Insureds soon after their accident and without giving the patients the opportunity to sufficiently respond to conservative physical therapy.

130.    In fact, experimental ESWT treatments were typically rendered on Insureds less than 20 days after their accidents.  For example:

(i)     The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named CD on September 1, 2021, only three days after the Insured's accident on August 29, 2021.

(ii)    The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named LS on August 30, 2021, only four days after the Insured's accident on August 26, 2021.

(iii)   The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named RG on August 30, 2021, only eight days after the Insured's accident on August 22, 2021.

(iv)    The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named CG on September 1, 2021, only nine days after the Insured's accident on August 23, 2021.

(v)    The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named LG on September 2, 2021, only nine days after the Insured's accident on August 24, 2021.

(vi)    The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named SD on September 8, 2021, only ten days after the Insured's accident on August 29, 2021.

(vii)    The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named UN on September 7, 2021, only eleven days after the Insured's accident on August 27, 2021.

(viii)    The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named RB on August 26, 2021, only thirteen days after the Insured's accident on August 13, 2021.

(ix)    The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named PJ on September 7, 2021, only fourteen days after the Insured's accident on August 24, 2021.

(x)    The Defendants purported to provide ESWT through the Poonawala Practice to an Insured named JH on September 2, 2021, only seventeen days after the Insured's accident on August 16, 2021.

131.    These are only representative examples. In all the claims identified in Exhibit "1", Defendants falsely represented that Fraudulent Services were medically necessary, when in fact they were not medically necessary for each Insured and provided pursuant to predetermined fraudulent protocols and were therefore not eligible to collect No-Fault Benefits in the first instance.

132.    In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service. More specifically, CPT Code 0101T only contemplates the billing for the

code once per date of service.  The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

133.    Notwithstanding the clear language of the code, the bills fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) for each section of the Insured's body to which the ESWT was performed, as illustrated in the billing example reproduced at paragraph 75.

134.    In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by three (3) times for each date of service, to the extent there was any actual legitimacy to the services provided in the first instance.

### 2.    The Fraudulent Charges for Transcranial Doppler Testing

135.    As with the EWST, Grody and the Management Defendants purported to subject many Insureds to medically unnecessary TCD.  The charges for the TCD were fraudulent in that the transcranial doppler tests were medically unnecessary and were performed, to the extent that they were performed at all, pursuant to the Defendants' fraudulent treatment protocols and illegal kickback and referral arrangements.

136.    Notably, Grody and the Management Defendants arranged for the Poonawala Practice to typically bill TCD to GEICO using CPT Codes 93886, 93890, and 93892, resulting in a charge of $1,641.79 for each session of TCD that was purportedly provided.

### a.    Legitimate Uses for TCD

137.    TCD is a noninvasive technique that uses sound waves to evaluate blood flow (blood circulation) in and around the brain.  TCD typically uses a doppler transducer that enables recording of blood flow velocities from intracranial arteries through selected cranial foramina and

38

thin regions of the skull.  Mapping of the sampled velocities as a color display of spectra locates the major brain arteries in three dimensions.

138.    TCD obtains information about the physiology of blood flow through the intracranial cerebrovascular system.  Depending on the type of measurement needed, TCD studies can take at least 45 minutes, if not more.  TCD evaluation of the intracranial cerebrovascular system is generally used in connection with the following:

- Vasopasm, following a ruptured brain aneurysm;
- Sickle cell anemia, to determine a patient's risk of stroke;
- Ischemic stroke;
- Intracranial stenosis or blockage of the blood vessels;
- Cerebral microemboli; and/or
- Patent Foramen Ovale, a hole in the heart that doesn't close properly after birth, which may provoke embolic stroke.

139.    The symptomology of the above-named conditions includes sudden severe headache with no known cause; numbness, weakness, or paralysis of the face, arm, leg, or one side of the body; confusion; trouble speaking, seeing, or walking; and/or sudden dizziness, loss of balance, or loss of coordination.  Headaches, dizziness, and head trauma by themselves are not indications for the performance of TCD studies of the intracranial cerebrovascular system.

140.    Moreover, in the event the Insureds did suffer from any such symptoms, the onset of those symptoms was neither sudden nor unexplained but rather a purported result of the motor vehicle accidents that caused the Insured to seek treatment at the No-Fault Clinics in the first instance.  In a legitimate setting, if a physician needs to examine a patient's intracranial blood flow, he or she orders a magnetic resonance angiogram ("MR angiogram") or a computed tomography angiogram ("CT angiogram"), both of which measure intracranial blood flow with

more accuracy than TCD.  Indeed, in the claims identified in Exhibit "1" there were virtually no clinical indications for the performance of TCD in an outpatient setting.

### b.    The Defendants' Fraudulent TCD Charges

141.    As with the EWST, Poonawala nor any other licensed physician performed independent evaluations on Insureds to determine if the TCD was medically necessary.  Rather, Grody and the Management Defendants had unlicensed technicians perform the TCD pursuant to referrals from the Referring Providers at the Clinics where they had established the unlawful referral relationships.

142.    In keeping with the fact that the TCD was performed pursuant to predetermined treatment protocols, the medical examinations performed by the Referring Providers often failed to screen for the symptoms that would warrant TCD.  To the extent the Referring Providers conducted medical examinations that assessed the Insureds' head pain and neurological symptoms, in virtually all cases where Grody and the Management Defendants purported to provide TCD, the Insureds did not suffer any sort of injury as the result of the automobile accident that would warrant the TCD.

143.    Indeed, in keeping with the fact that that the TCD was medically useless and performed on a protocol basis rather than to benefit any of the Insureds, the diagnoses generated by the Referring Providers and listed on Poonawala's billing to justify the TCD they administered to Insureds were often directly contradicted by the medical records generated by the Referring Providers.  Despite virtually none of the Insureds who received TCD displaying symptoms warranting the testing, the Defendants submitted, or caused to be submitted, hundreds of thousands of dollars in bills for TCD to GEICO.  Specifically, virtually none of the Insureds who allegedly received TCD by the Poonawala Defendants reported suffering sudden and/or unexplained severe

headaches, numbness or weakness, confusion, trouble speaking, seeing, or walking, and/or sudden

dizziness, loss of balance, and/or coordination. For example:

(i) On May 21, 2021, Insured TD was purportedly involved in a motor vehicle accident. On June 2, 2021, TD sought treatment with Emmons Avenue Medical at a No-Fault Clinic located at 146 Empire Boulevard, Brooklyn, New York with Dr. Oganesov. At that examination TD reported no head injury, headaches, dizziness, vertigo, tinnitus, or numbness in his extremities. TD's head, eyes, ears, nose and throat examination ("HEENT") was normal, and his gait, facial sensation and movement, speech, and judgment were intact. Nevertheless, on June 15, 2021, TD underwent TCD with the Poonawala Practice at 146 Empire Boulevard, Brooklyn pursuant to a referral from Dr. Oganesov.

(ii) On May 21, 2021, Insured TJ was purportedly involved in the same motor vehicle accident as TD supra. On June 2, 2021, TJ sought treatment with Emmons Avenue Medical at a No-Fault Clinic located at 146 Empire Boulevard, Brooklyn, New York with Dr. Oganesov. At that examination TJ reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. TJ's HEENT was normal, and his gait, facial sensation and movement, speech, and judgment were intact. Nevertheless, on July 13, 2021, TJ underwent TCD with the Poonawala Practice at 146 Empire Boulevard, Brooklyn, New York, pursuant to a referral from Dr. Oganesov.

(iii) On April 2, 2021, Insured RO was purportedly involved in a motor vehicle accident. On April 8, 2021, RO sought treatment with Bedford Medical Services, P.C. ("Bedford Medical") at a No-Fault Clinic located at 108 Kenilworth Place, Brooklyn, New York with Su Jung Lee, FNP ("FNP Lee"). There was no examination report submitted to GEICO for this visit. On May 6, 2021, RO again sought treatment with Bedford Medical and underwent a follow-up examination with FNP Lee. At the follow up examination, RO reported no head injury, headaches, dizziness, vertigo, tinnitus, or numbness in his extremities. RO's HEENT was normal, and his gait, facial sensation and movement, speech, and judgment were intact. The report was electronically signed by Kristappa Sangavaram, M.D. ("Dr. Sangavaram"). Nevertheless, on June 1, 2021, RO underwent TCD with the Poonawala Practice at 108 Kenilworth Place, Brooklyn pursuant to a referral from Dr. Sangavaram.

(iv) On July 2, 2021, Insured LV was purportedly involved in a motor vehicle accident. On August 8, 2021, LV sought treatment with S. Ramachandran Nair, M.D., P.C. ("Nair PC") at a No-Fault Clinic located at 1655 Richmond Avenue, Staten Island, New York with S. Ramachandran Nair, M.D ("Dr. Nair"). At that examination, LV reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. LV's HEENT was normal, and his

gait, facial sensation and movement, speech, and judgment were intact.  On September 8, 2021, LV sought treatment with Nair PC and underwent a follow up examination with Dr. Nair. At that examination, LV reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. LV's HEENT was normal, and his gait, facial sensation and movement, speech, and judgment were intact. Nevertheless, on September 9, 2021, LV underwent TCD with the Poonawala Practice at 1655 Richmond Avenue, Staten Island, New York, pursuant to a referral from Dr. Nair.

(v)     On July 14, 2021, Insured MA was purportedly involved in a motor vehicle accident. On July 27, 2021, MA sought treatment with Alexander Kolesnikov, M.D. ("Kolesnikov Practice") at a No-Fault Clinic located at 9801 Foster Avenue, Brooklyn, New York with Alexander Kolesnikov, M.D ("Dr. Kolesnikov"). At that examination, MA reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. MA's HEENT was normal, and his gait, facial sensation and movement, speech, and judgment were intact.  On September 8, 2021, MA sought treatment with Kolesnikov Practice and underwent a follow up examination with Dr. Kolesnikov. At that examination, MA reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. Nevertheless, on September 20, 2021, MA underwent TCD with the Poonawala Practice at 9801 Foster Avenue, Brooklyn pursuant to a referral from Dr. Kolesnikov.

(vi)    On July 14, 2021, Insured MH was purportedly involved in a motor vehicle accident. On July 27, 2021, MH sought treatment with the Kolesnikov Practice at a No-Fault Clinic located at 9801 Foster Avenue, Brooklyn, New York with Dr. Kolesnikov. At that examination, MH reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. MH's HEENT was normal, and his gait, facial sensation and movement, speech, and judgment were intact.  Nevertheless, on September 7, 2021, MH underwent TCD with the Poonawala Practice at 9801 Foster Avenue, Brooklyn pursuant to a referral from Dr. Kolesnikov.

(vii)   On April 11, 2021, Insured RL was purportedly involved in a motor vehicle accident. On May 25, 2021, RL sought treatment with Zakaria Medical Service, P.C. ("Zakaria Medical") at a No-Fault Clinic located at 3432 East Tremont Avenue, Bronx, New York with Muhammad Zakaria, M.D ("Dr. Zakaria"). At that examination, RL reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. Nevertheless, on August 25, 2021, RL underwent TCD with the Poonawala Practice at 3432 East Tremont Avenue, Bronx pursuant to a referral from Dr. Zakaria.

(viii)  On August 31, 2021, Insured LA was purportedly involved in a motor vehicle accident. On September 24, 2021, LA sought treatment with Wellbeing NP In Family Health, PLLC ("Wellbeing NP") at a No-Fault Clinic located at 1735 Pitkin Avenue, Brooklyn, New York with Bu

Kyungsook, NP ("NP Kyungsook"). At that examination, LA reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. Nevertheless, on September 28, 2021, LA underwent TCD with the Poonawala Practice at 1735 Pitkin Avenue, Brooklyn pursuant to a referral from NP Kyungsook.

(ix)    On August 31, 2021, Insured CA was purportedly involved in the same motor vehicle accident as LA, supra. On September 24, 2021, CA sought treatment with Wellbeing NP at a No-Fault Clinic located at 1735 Pitkin Avenue, Brooklyn, New York with NP Kyungsook. At that examination, CA reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. Nevertheless, on September 28, 2021, CA underwent TCD with the Poonawala Practice at 1735 Pitkin Avenue, Brooklyn pursuant to a referral from NP Kyungsook.

(x)    On July 4, 2021, Insured MG was purportedly involved in a motor vehicle accident. On August 24, 2021, MG sought treatment with Jordan Fersel, M.D., P.C. ("Fersel PC") at a No-Fault Clinic located at 4226-A Third Avenue, Bronx, New York with Jordan Fersel, M.D. ("Dr. Fersel"). At that examination, MG reported no head injury, dizziness, vertigo, tinnitus, or numbness in his extremities. Nevertheless, on October 6, 2021, MG underwent TCD with the Poonawala Practice at 4226-A Third Avenue, Bronx pursuant to a referral from Dr. Fersel.

144. Moreover, in keeping with the fact that the TCD purportedly performed was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, Grody and the Management Defendants routinely provided TCD to multiple Insureds involved in the same accident at or about the same time. For example:

(i)    On August 16, 2021, four insureds – AT, GT, JF, and VT – were involved in the same automobile accident. Thereafter, AT, GT, JF, and VT all – incredibly – underwent TCD with the Poonawala Practice on September 30, 2021.

(ii)    On May 3, 2021, two insureds – TL and TT – were involved in the same automobile accident. Thereafter, TL and TT both – incredibly – underwent TCD with Poonawala Practice on August 4, 2021.

(iii)    On May 10, 2021, two insureds – JH and MD – were involved in the same automobile accident. Thereafter, JH and MD both – incredibly – underwent TCD with the Poonawala Practice on August 26, 2021.

(iv)    On August 11, 2021, two insureds – FD and ZG – were involved in the same automobile accident. Thereafter, FD and ZG both – incredibly – underwent TCD with the Poonawala Practice on September 14, 2021.

(v)    On July 24, 2021, two insureds – VV and KL – were involved in the same automobile accident. Thereafter, VV and KL both – incredibly – underwent TCD with the Poonawala Practice on August 16, 2021.

(vi)    On June 26, 2021, two insureds – JF and LF – were involved in the same automobile accident. Thereafter, JF and LF both – incredibly – underwent TCD with Poonawala Practice on August 10, 2021.

(vii)    On April 11, 2021, two insureds – JB and CP – were involved in the same automobile accident. Thereafter, JB and CP both – incredibly – underwent TCD with Poonawala Practice on July 21, 2021.

(viii)    On April 29, 2021, two insureds – AP and JR – were involved in the same automobile accident. Thereafter, AP and JR both – incredibly – underwent TCD with Poonawala Practice on July 15, 2021.

(ix)    On June 14, 2021, two insureds – AV and DR – were involved in the same automobile accident. Thereafter, AV and DR both – incredibly – underwent TCD with Poonawala Practice on June 23, 2021.

145.    These are only representative examples. In many of the claims identified in Exhibit "1", two or more Insureds who had been involved in the same underlying accident received TCD from the Poonawala Practice at or about the same time, despite the fact that the Insureds were differently situated.

146.    As with the other Fraudulent Services, the TCD was rendered and billed pursuant to the Defendants' fraudulent treatment and billing protocol that was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.  Indeed, even had the Insureds displayed symptoms warranting TCD, in a legitimate clinical setting the practitioner would initially administer a transcranial doppler study of the intracranial arteries, billed under CPT 93886, and would only proceed to perform a vasoreactivity test, billed under CPT 93890, or a microemboli study, billed under CPT 93892 if the Insured

displayed symptomology warranting that additional testing. Nevertheless, the Poonawala Practice purported to provide all three studies on very Insured who received TCD.

147.    In further keeping with the fact that the TCD results were unreliable and useless, the data generated as a result of the TCD appears to have been fabricated.  Specifically, the TCD performed and billed through the Poonawala Practice generated "TCD Exam Data."  The "depth" measurement contained in the "TCD Exam Data" purports to measure the size of each Insured's head, as well as the location of blood vessels therein.  However, many Insureds who allegedly underwent TCD performed by the Poonawala Defendants had virtually identical depth measurements. In other words, according to the TCD Exam Data generated, Insureds who allegedly treated with the Poonawala Defendants had virtually identically sized heads with virtually identically located blood vessels:

(i)     On August 1, 2021, an Insured named CY was involved in a motor vehicle accident. On August 16, 2021, CY allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

(ii)    On August 5, 2021, an Insured named ER was involved in a motor vehicle accident. On September 1, 2021, ER allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

(iii)   On August 9, 2021, an Insured named ES was involved in a motor vehicle accident. On September 20, 2021, ES allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

(iv)    On May 3, 2021, an Insured named TT was involved in a motor vehicle accident. On August 4, 2021, TT allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was

generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

(v)　　On August 24, 2021, an Insured named AG was involved in a motor vehicle accident. On October 6, 2021, AG allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

(vi)　　On August 4, 2021, an Insured named PS was involved in a motor vehicle accident. On August 16, 2021, PS allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

(vii)　　On August 23, 2021, an Insured named CG was involved in a motor vehicle accident. On September 1, 2021, CG allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

(viii)　　On July 30, 2021, an Insured named AM was involved in a motor vehicle accident. On August 16, 2021, AM allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

(ix)　　On June 7, 2021, an Insured named CB was involved in a motor vehicle accident. On August 30, 2021, CB allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

(x)　　On August 29, 2021, an Insured named CD was involved in a motor vehicle accident. On September 1, 2021, CD allegedly received TCD from the Poonawala Practice. As a result of that TCD, a TCD Exam Data report was generated with the following depth values: 56, 62, 67, 56, 62, 62, 67, 62, 85, 56, 56, 56, 56.

148.　　These are only representative examples. It is beyond biological possibility that most Insureds who purportedly treated with Poonawala would present with identical depth measurements.

### 3. The Fraudulent Charges for Videonystagmography ("VNG") Tests

149. Grody and the Management Defendants, also purported to subject many Insureds to medically unnecessary videonystagmography ("VNG") tests. The charges for the VNG tests were fraudulent in that the VNG tests were medically unnecessary and were performed, to the extent that they were performed at all, pursuant to the payments that were provided to the Clinics.

150. Once Grody and the Management Defendants subjected Insureds to the medically unnecessary VNG tests, they then typically billed GEICO for the performance of the VNG tests through the Poonawala Practice using CPT codes 92537, 92540, 92546, 92547, and 92548, generally resulting in charges to GEICO of hundreds of dollars, or in some cases, charges exceeding $1,000.00 per Insured per date of service.

### a. Legitimate Uses for VNG Tests

151. VNG consists of tests that can be used to determine the cause of a patient's vertigo or balance disorder. In other words, VNG tests are not used to confirm the existence of dizziness or balance disorder, but rather to identify the origin of the condition in the relatively rare cases where it cannot be determined through an ear, nose and throat ("ENT") or neurological medical examination. Generally, VNG tests are employed to determine the source of the generation of vertigo, i.e., the inner ear or brain.

152. VNG tests should not be used as a first-line diagnostic procedure when a patient reports dizziness as the result of automobile accident trauma. A legitimate diagnostic process for a patient reporting dizziness following an automobile accident should begin with a history and physical examination, including an ENT and neurological examination. VNG tests record involuntary eye movements, called nystagmus, using video imaging technology. The nystagmus is recorded and analyzed using sophisticated video goggles which are equipped with infrared video

cameras. The patient wears these goggles while being subjected to various stimuli, which duplicates the extraocular movement portion of the physical examination.

153.    There are four main components to VNG testing: (i) the saccade test, which evaluates rapid eye movements between fixation points; (ii) the tracking test, which evaluates movement of the eyes as they pursue a visual target; (iii) the positional test, which measures eye movements associated with positions of the head; and (iv) the caloric test, which measures responses to warm or cold water or air circulated through the ear canal. The cameras record the eye movements and display them on a video/computer screen. This allows the physician to see how the eyes move, which helps the physician assess the patient's balance, which in turn helps the physician assess the source of vertigo.

154.    To properly administer a VNG test, the patient must be prepared appropriately. This preparation typically requires 72 hours of abstention from medication (with the exception of heart, high blood pressure and anticonvulsant medications); 24 hours of abstention from stimulants such as caffeine, as well as alcohol; and three hours of food abstention. In addition, patients must be provided with a pre-test history and examination, to determine, among other things, the nature of the problematic symptoms and the patient's eye movements.

### b.    The  Fraudulent VNG Test Charges

155.    Poonawala never performed an independent history, examination of or evaluations on Insureds to determine if the VNG testing was medically necessary.  In fact, the VNG testing was performed pursuant to referrals issued within the Clinic by the Referring Providers as part of a pre-determined protocol and the unlawful financial and referral relationships that Grody and the Management Defendants had established.

156.    To the extent the Referring Providers conducted medical history and examinations that assessed the Insureds' neurological symptoms, virtually none of the Insureds who allegedly received VNG testing through the Poonawala Practice reported experiencing dizziness, imbalance, or vertigo in the examination reports that preceded the VNG testing.

157.    In even more egregious cases, the Referring Providers never actually conducted an examination or created any examination reports.   Nevertheless, Grody and the Management Defendants subjected the Insureds to multiple rounds of testing. For example:

(i)      On August 11, 2021, an Insured named FG was purportedly involved in a motor vehicle accident. On September 9, 2021, FG sought treatment with Macintosh Medical, P.C. ("Macintosh Medical") at a No-Fault Clinic located at 3626 Bailey Avenue, Bronx, New York with Hiram Luigi-Martinez, M.D. ("Dr. Luigi-Martinez"). At that examination, FG reported no dizziness, vertigo, or tinnitus. Nevertheless, on September 14, 2021, FG underwent VNG with the Poonawala Practice at 3626 Bailey Avenue, Bronx, New York pursuant to a referral from Dr. Luigi-Martinez.

(ii)     On August 1, 2021, a patient named CY was purportedly involved in a motor vehicle accident. On August 16, 2021, CY allegedly underwent a medical examination with Michael Jurkowich, M.D. ("Dr. Jurkowich") who referred CY to the Poonawala Practice for VNG testing.  Dr. Jurkowich's examination report was not submitted to GEICO.  Nevertheless, on August 16, 2021 – the same day as the alleged examination from Dr. Jurkowich – CY underwent VNG testing with the Poonawala Defendants.

(iii)    On July 28, 2021, a patient named GT was purportedly involved in a motor vehicle accident. On July 29, 2021, GT sought treatment with CityMD Bedstuy at 1243 Fulton Street, Brooklyn, New York with Christina Hamm, D.O. ("Dr. Hamm"). At that examination, GT reported no dizziness, vertigo, or tinnitus.  On August 23, 2021, GT allegedly underwent a medical examination with Sujung Lee, MSN, FNP-C ("FNP Lee") who referred GT to the Poonawala Practice for VNG testing.  FNP Lee's examination report was not submitted to GEICO.  Nevertheless, on August 23, 2021 – the same day as the alleged examination from FNP Lee – GT underwent VNG testing by the Poonawala Defendants.

(iv)     On August 5, 2021, a patient named ER was purportedly involved in a motor vehicle accident. On September 1, 2021, ER allegedly underwent a medical examination with Conrad Cean, M.D. ("Dr. Cean") who referred ER to the Poonawala Practice for VNG testing.  Dr. Cean's examination report was

not submitted to GEICO. Nevertheless, on September 1, 2021 – the same day as the alleged examination from Dr. Cean – ER underwent VNG testing with the Poonawala Defendants.

(v)     On August 9, 2021, an Insured named ES was purportedly involved in a motor vehicle accident. On August 30, 2021, ES sought treatment with Sudha Patel, M.D. PLLC ("Sudha Patel PLLC") at a No-Fault Clinic located at 176 Wilson Avenue, Brooklyn, New York with Sudha Patel, M.D. ("Dr. Patel"). At that examination, ES reported no dizziness, vertigo, or tinnitus and Dr. Patel did not mention VNG testing. Nevertheless, on September 20, 2021, ES underwent VNG with the Poonawala Practice at 176 Wilson Avenue, Brooklyn, New York pursuant to a referral from Dr. Patel.

(vi)    On June 15, 2021, an Insured named CS was purportedly involved in a motor vehicle accident. On June 24, 2021, CS sought treatment with Emmons Avenue Medical Office, P.C. ("Emmons Avenue Medical") at a No-Fault Clinic located at 146 Empire Boulevard, Brooklyn, New York with Ruben Oganesov, M.D. ("Dr. Oganesov"). At that examination, CS reported no dizziness, vertigo, or tinnitus and Dr. Oganesov did not mention VNG testing. Nevertheless, on June 29, 2021, CS underwent VNG with the Poonawala Practice at 146 Empire Boulevard, Brooklyn, New York pursuant to a referral from Dr. Oganesov.

(vii)   On July 8, 2021, an Insured named CC was purportedly involved in a motor vehicle accident. On July 13, 2021, CC sought treatment with Alexander Kolesnikov, M.D. ("Dr. Kolesnikov") at a No-Fault Clinic located at 9801 Foster Avenue, Brooklyn, New York. At that examination, CC reported no dizziness, vertigo, or tinnitus and Dr. Kolesnikov did not mention VNG testing. Further, on August 18, 2021, CC had a follow-up examination with Dr. Kolesnikov where CC again reported no dizziness, vertigo, or tinnitus and Dr. Kolesnikov did not mention VNG testing. Nevertheless, on August 24, 2021, CC underwent VNG with the Poonawala Practice at 9801 Foster Avenue, Brooklyn, New York pursuant to a referral from Dr. Kolesnikov.

(viii)  On May 15, 2021, an Insured named AG was purportedly involved in a motor vehicle accident. On May 24, 2021, AG sought treatment at Emmons Avenue Medical at a No-Fault Clinic located at 146 Empire Boulevard, Brooklyn, New York with Dr. Oganesov. At that examination, AG reported no dizziness, vertigo, or tinnitus and Dr. Oganesov did not mention VNG testing. Further, on June 7, 2021, AG had an initial examination with Ronald Daly, M.D. ("Dr. Daly") where AG again reported no dizziness, vertigo, or tinnitus and Dr. Daly did not mention VNG testing. Nevertheless, on June 15, 2021, AG underwent VNG with the Poonawala Practice at 146 Empire Boulevard, Brooklyn, New York pursuant to a referral from Dr. Oganesov.

     (ix)    On August 4, 2021, a patient named PS was purportedly involved in a motor vehicle accident. On August 16, 2021, PS allegedly underwent a medical examination with Dr. Jurkowich who referred PS to Poonawala for VNG testing. Dr. Jurkowich's examination report was not submitted to GEICO. Nevertheless, on August 16, 2021 – the same day as the alleged examination from Dr. Jurkowich – PS underwent VNG testing with the Poonawala Practice.

     (x)    On August 23, 2021, a patient named CG was purportedly involved in a motor vehicle accident. On August 25, 2021, CG underwent a medical examination at Englewood Orthopedics Group, P.C. with Jaime Gutierrez, M.D. ("Dr. Gutierrez") at which CG reported no dizziness or vertigo. On September 1, 2021, CG allegedly underwent a medical examination with Dr. Jurkowich who referred CG to Poonawala for VNG testing. Dr. Jurkowich's examination report was not submitted to GEICO. Nevertheless, on September 1, 2021– the same day as the alleged examination from Dr. Jurkowich – CG underwent VNG testing with the Poonawala Practice.

158.    These are only representative examples. In virtually all of the claims identified in Exhibit "1", the Insureds who allegedly received VNG testing by the Poonawala Defendants did so despite exhibiting no dizziness, vertigo, tinnitus, or gait abnormalities. Although virtually none of the Insureds who received VNG displayed symptoms warranting the testing, the Defendants submitted, or caused to be submitted, hundreds of thousands of dollars in bills for VNG to GEICO, as part of the fraudulent treatment and billing scheme.

159.    Furthermore, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident. It is extremely improbable – to the point of biological impossibility – that multiple Insureds involved in the same automobile accident who treated at a specific Clinic would routinely require VNG testing at or about the same time. Even so, and in keeping with the fact that the VNG testing allegedly performed by the Poonawala Defendants was not medically

necessary and was performed pursuant to predetermined protocols to maximize profits, VNG

testing was routinely provided to multiple Insureds involved in the same accident at or about the

same time.

160.   For example:

(i)      On May 3, 2021, two insureds – TL and TT – were involved in the same automobile accident.  Thereafter, TL and TT both – incredibly – received VNG testing from the Poonawala Practice on the same exact date, August 4, 2021.

(ii)     On July 24, 2021, two insureds – VV and KL – were involved in the same automobile accident.  Thereafter, VV and KL both – incredibly – received VNG testing from the Poonawala Practice on the same exact date, August 16, 2021.

(iii)    On June 26, 2021, two insureds – JF and LF – were involved in the same automobile accident.  Thereafter, JF and LF both – incredibly – received VNG testing from the Poonawala Practice on the same exact date, August 10, 2021.

(iv)    On April 11, 2021, two insureds – JB and CP – were involved in the same automobile accident.  Thereafter, JB and CP both – incredibly – received VNG testing from the Poonawala Practice on the same exact date, July 21, 2021.

(v)     On April 29, 2021, two insureds – AP and JR – were involved in the same automobile accident.  Thereafter, AP and JR both – incredibly – received VNG testing from the Poonawala Practice on the same exact date, July 15, 2021.

(vi)    On June 14, 2021, two insureds – AV and DR – were involved in the same automobile accident.  Thereafter, AV and DR both – incredibly – received VNG testing from the Poonawala Practice on the same exact date, June 23, 2021.

(vii)   On June 7, 2021, two insureds – ES and GR – were involved in the same automobile accident.  Thereafter, ES and GR both – incredibly – received VNG testing from the Poonawala Practice on the same exact date, June 23, 2021.

(viii)  On May 23, 2021, two insureds – AN and KN – were involved in the same automobile accident.  Thereafter, AN and KN both – incredibly – received

VNG testing from the Poonawala Practice <u>on the same exact date</u>, June 30, 2021.

(ix)    On September 2, 2021, two insureds – AP and SP – were involved in the same automobile accident.  Thereafter, AP and SP both – incredibly – received VNG testing from the Poonawala Practice <u>on the same exact date</u>, September 29, 2021.

(x)     On June 10, 2021, two insureds – LB and JB – were involved in the same automobile accident.  Thereafter, LB and JB both – incredibly – received VNG testing from the Poonawala Practice <u>on the same exact date</u>, September 9, 2021.

161.    These are only representative examples. In many of the claims identified in Exhibit "1," two or more Insureds who had been involved in the same underlying accident allegedly received VNG testing from the Poonawala Defendants at or about the same time, despite the fact that the Insureds were differently situated.  Moreover, even if an Insured reported the existence of some general form of dizziness or balance disorder, the VNG tests that supposedly were provided were medically unnecessary because the cause of the Insured's dizziness or imbalance could be identified through the physical examinations that the Poonawala Defendants routinely purported to provide, and the patient histories that they purported to take, during every initial examination/consultation and follow-up examination.

162.    In keeping with the fact that the VNG tests that supposedly were provided by the Poonawala Defendants were medically unnecessary, no physician or healthcare provider associated with the Poonawala Defendants properly prepared the Insureds for the tests. This, in turn, rendered the data that the Poonawala Defendants purported to obtain from the tests unreliable and useless.  Because the Poonawala Defendants' VNG tests were unreliable and useless, the data that the Poonawala Defendants purported to obtain from the tests was not incorporated into any Insured's treatment plan. In virtually every case in which the VNG tests returned a positive result

the Insured did not undergo any form of vestibular rehabilitation, balance retraining, or any other therapy to address their putative balance issues.

163.    In further keeping with the fact that the VNG tests were unreliable and useless, (i) in many instances when the VNG tests returned inconclusive results, the Insureds did not undergo additional testing to generate conclusive results, and (ii) virtually all the VNG reports contain pre-printed, boilerplate language, stating "patient c/o recurrent episodes of dizziness and headaches" even though virtually none of the patients who treated with the Poonawala Practice actually complained of recurrent episodes of dizziness.

164.    In further keeping with the fact that the VNG tests were unreliable and useless, to the extent the Poonawala Defendants generated test reports as a result of the VNG tests, which virtually always contained the following preprinted boilerplate test results:

> Oculomotor Tests:
> 1. Visual pursuit- Smooth accurate pursuit movements with normal gain.
> 2. Saccades - Normal peak velocity and normal delay.
> 3. Visual optokinetic Test - OPK nystagmus is rhythmic, with normal and symmetric waveform morphology.
> Gaze:
> 1. Spontaneous Nystagmus - not present.
> 2. Gaze Evoked Nystagmus - there was no nystagmus appears in any position of gaze.
> Rotational tests- Active head rotation tests (AHR) in the horizontal and vertical directions were within normal thresholds.
> Torsion Tests: - Normal waveform morphology.
> Positioning and Positional Subtests:
> Dix-Hallpikes (left, right): Negative for Hallpike findings and benign paroxysmal positioning vertigo (BPPV) diagnosis. No nystagmus evoked.
> Positional Tests: Positional testing was unremarkable in all head and body positions.
> Bithermal Caloric Tests: The responses to warm and cool caloric were without unilateral weakness bilaterally. Caloric fixation suppression was normal for all four irrigations.

165.    Similarly, in keeping with the fact that the VNG tests were unreliable and useless, to the extent the Poonawala Defendants generated test reports as a result of the VNG tests, the test reports virtually always contained the following preprinted boilerplate Summary and Impression, and Recommendations:

Summary and Impression: Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.

Recommendations: Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

166.     Moreover, despite the fact that the reports virtually always recommend balance rehabilitation in the pre-printed recommendations, virtually none of the Insureds who allegedly received VNG testing with the Poonawala Defendants underwent balance rehabilitation.

167.     As with the other Fraudulent Services, the VNG testing was part of the Defendants' fraudulent treatment and billing protocol, and was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

**F.     The Fraudulent Billing for Independent Contractor Services**

168.     The Defendants' where able to conduct their fraudulent scheme by submitting claims to GEICO, and other automobile insurers, using Poonawala's name and the Poonawala Practice seeking payment for services that he never provided, and were provided by individuals that were never employed by him or the medical "practice", to the extend any services were provided at all.

169.     Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors.  The healthcare services must be provided by the billing provider itself, or by its employees.

170.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed

by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); <u>DOI Opinion Letter</u>, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); <u>DOI Opinion Letter</u>, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); <u>DOI Opinion Letter</u>, October 29, 2003 (extending the independent contractor rule to hospitals).

171.    The Defendants submitted, or caused to be submitted, more than 1,700 bills to GEICO using the United States mails and seeking payment for the Fraudulent Services purportedly provided to hundreds of Insureds at more than 40 different clinic locations during a period of less than five (5) months, while falsely representing in every bill that Poonawala was the provider of the service in question, including occasions where services were purportedly provided by Poonawala to dozens of patients at different locations on a single day.  This misrepresentation was made intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation had been made regarding who actually performed the services and their relationship to the billing provider, which was being unlawfully operated and controlled by Grody, the Management Defendants, and the John Doe Defendants.

172.    In fact, every NF-3 form that was submitted to GEICO by the Defendants falsely represented that Poonawala, as the owner of the Poonawala Practice, had actually performed the service.

173.     Additionally, every NF-3 form submitted to GEICO by the Defendants falsely represented that Poonawala, as the owner of the Poonawala Practice, had actually reviewed and approved the billing for the services as well as the AOBs (assignment of benefits forms) that would have enabled direct payment to have been made to the medical "practice" sole proprietorship for services allegedly rendered to the patient.

174.     In fact, the statements in each of the NF-3 forms were false and fraudulent in that the individuals who performed the Fraudulent Services were never (i) employed by Poonawala or the Poonawala Practice, (ii) under Poonawala's direction and/or control, or (iii) paid by Poonawala or the Poonawala Practice.  Upon information and belief, technicians performed the services and were paid by Grody, the Management Defendants and the John Doe Defendants without regard to Poonawala's ownership, direction or control of the "practice" that was operated using his name and license.

175.     Because the Fraudulent Services – to the extent provided at all – were performed by individuals not employed by Poonawala and/or the Poonawala Practice, the Defendants never had any right to bill or to collect No-fault benefits for that reason, in addition to all of the others identified in this complaint. The Defendants' misrepresentations and acts of fraudulent concealment were consciously designed to mislead GEICO into believing that it was obligated to pay for the Fraudulent Services, when in fact GEICO was not.

**III.     The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

176.     To support their fraudulent charges, Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, assignment of benefits forms and medical reports/records using the name of the Poonawala Practice and its tax identification numbers

seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

177.    The NF-3 forms, reports, assignment of benefits and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of Poonawala Defendants uniformly misrepresented that Poonawala had performed the Fraudulent Services and that his name, license and the tax identification number of the Poonawala Practice was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that Grody, the Management Defendants and John Doe Defendants unlawfully and secretly controlled, operated and managed the medical "practice".

(ii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of Poonawala Defendants uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided;

(iii)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Poonawala Defendants, uniformly concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to result of illegal financial arrangements between the Defendants and the Clinics;

(iv)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Poonawala Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and

(v)     The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Poonawala Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided by unlicensed individuals not employed by Poonawala or the Poonawala Practice.

## IV.    **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

178.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

179.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

180.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Poonawala in the performance of the Fraudulent Services and Poonawala's ownership, control and/or management of the Poonawala Practice.  Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

181.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.  In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals that were employed by Poonawala and/or the Poonawala Practice.

182.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly

and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $667,000.00 based upon the fraudulent charges.

183.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against Poonawala and the Poonawala Practice**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

184.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 183 of this Complaint as if fully set forth at length herein.

185.    There is an actual case and controversy between GEICO on the one hand and Poonawala and the Poonawala Practice on the other hand regarding more than $1.6 million in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

186.    Poonawala and the Poonawala Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to illegal kickbacks and referral relationships between Grody, the Management Defendants, the John Doe Defendants and the Clinics.

187.    Poonawala and the Poonawala Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent

protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

188.    Poonawala and the Poonawala Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

189.    Poonawala and the Poonawala Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

190.    Poonawala and the Poonawala Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to result of illegal financial arrangements between the Defendants and the Clinics.

191.    Poonawala and the Poonawala Practice have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by Poonawala and were instead performed - to the extent that they were provided at all - by unlicensed individuals who were neither supervised by nor employed by Poonawala or the Poonawala Practice.

192.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Poonawala and the Poonawala Practice have no right to receive payment for any pending bills submitted to GEICO.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against Poonawala, Grody, the Managements Defendants and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

193.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 183 of this Complaint as if fully set forth at length herein.

194.    The Poonawala Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.  Poonawala, Grody, the Management Defendants and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Poonawala Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Poonawala Practice was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by Grody, the Management Defendants and the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers, (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided, and (v) the billed

for services - to the extent provided at all - were not provided by Poonawala or any other licensed physician, but by persons who were unlicensed, not directly supervised by Poonawala or employed by the Poonawala Practice.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

195.    The Poonawala Practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Defendants operated the Poonawala Practice, inasmuch as the Poonawala Practice never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the Poonawala Practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through the Poonawala Practice to the present day.

196.    The Poonawala Practice is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Poonawala Practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $667,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Poonawala Practice.

197.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against Poonawala, Grody, the Management Defendants, the Laundering Defendants, and**
**John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

198.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 183 of this Complaint as if fully set forth at length herein.

199.    The Poonawala Practice is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

200.    Poonawala, Grody, the Management Defendants, the Laundering Defendants and the John Doe Defendants are employed by and/or associated with the Poonawala Practice. Poonawala, Grody, the Management Defendants, the Laundering Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Poonawala Practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Poonawala Practice was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by Grody, the Management Defendants and the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers, (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of result of illegal financial arrangements between the Defendants and the Clinics, (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the

Defendants, rather than to treat or otherwise benefit the Insureds, (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided, and (v) the billed for services - to the extent provided at all - were not provided by Poonawala or any other licensed physician, but by persons who were unlicensed, not directly supervised by Poonawala or employed by the Poonawala Practice. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

201. Poonawala, Grody, the Management Defendants, the Laundering Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

202. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $677,000.00 pursuant to the fraudulent bills submitted by Defendants through the Poonawala Practice.

203. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

<u>**AS AND FOR A FOURTH CAUSE OF ACTION**</u>
**Against the Poonawala Defendants, Grody, the Management Defendants**
**and the John Doe Defendants**
**(Common Law Fraud)**

204. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 183 of this Complaint as if fully set forth at length herein.

205. The Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to

GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

206.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Poonawala had performed the Fraudulent Services and that his name, license and the tax identification number of the Poonawala Practice was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Poonawala never performed any of the services and Grody, the Management Defendants and the John Doe Defendants unlawfully and secretly controlled, operated and managed the Poonawala Practice, (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided, (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal financial arrangements between the Defendants and the Clinics, (iv) the representation that the billed for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Poonawala, when in fact the services were provided by unlicensed individuals that were never supervised by Poonawala or employed by the Poonawala practice.

207.    The Poonawala Defendants, Grody, the Management Defendants and the John Doe Defendants intentionally made the above–described false and fraudulent statements and concealed

material facts in a calculated effort to induce GEICO to pay charges submitted through the Poonawala Practice that were not compensable under New York no-fault insurance laws.

208.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $667,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants.

209.    The Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

210.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Poonawala Defendants, Grody, the Management Defendants,**
**and the John Doe Defendants**
**(Unjust Enrichment)**

211.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 183 of this Complaint as if fully set forth at length herein.

212.    As set forth above, the Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

213.    When GEICO paid the bills and charges submitted by or on behalf of the Poonawala Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such

payments based on the Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

214.    The Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that they voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

215.    The Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

216.    By reason of the above, the Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $667,000.00.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Against the Laundering Defendants**
**(Aiding and Abetting Fraud)**

217.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

218.    The Laundering Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Grody, the Management Defendants, and John Doe Defendants "1" through "10.

219.    The acts of the Laundering Defendants in furtherance of the fraudulent scheme described herein included, among other things: (i) associating with Grody, the Management Defendants and the John Doe Defendants to falsely create the appearance that the Laundering Defendants provided legitimate goods and/or services to the Poonawala Defendants; (ii)

concealing the identities and involvement of unlicensed laypersons in the fraudulent scheme; and (iii) laundering the advances paid by the Funders for the purpose of allowing unlicensed laypersons to profit from their participation in the fraudulent scheme and to pay expenses to fund the fraudulent scheme, including payments to access the Clinics.

220.    The conduct of the Laundering Defendants in furtherance of the fraudulent scheme was significant and material. The conduct was a necessary part of and was critical to the success of the overall fraudulent scheme because, without their participation and their actions, Grody, the Management Defendants and the John Doe Defendants would not have been able to (i) conceal the identities and participation of unlicensed laypersons in the fraudulent scheme and (ii) funnel monies to unlicensed laypersons and entities and pay expenses to fund the fraudulent scheme, including payments to access the Clinics.

221.    The Laundering Defendants aided and abetted the fraudulent scheme in a calculated effort to allow Grody, the Management Defendants, the John Doe Defendants and other unlicensed laypersons to participate and profit from the fraudulent scheme and pay the expenses to fund the scheme.

222.    The conduct of the Laundering Defendants caused GEICO to pay more than $667,000.00 pursuant to the fraudulent bills, assignment of benefit forms and other supporting documentation that the Defendants submitted, or caused to be submitted, to GEICO through the Poonawala Practice.

223.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

224.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## **JURY DEMAND**

225.     Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.     On the First Cause of Action against Poonawala and the Poonawala Practice, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Poonawala and Poonawala Practice have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B.     On the Second Cause of Action against Poonawala, Grody, the Management Defendants, and John Doe Defendants "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $667,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Poonawala, Grody, the Management Defendants, the Laundering the Defendants and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $667,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against the Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants, compensatory damages in favor of

GEICO in an amount to be determined at trial but in excess of $667,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

E.      On the Fifth Cause of Action against all the Poonawala Defendants, Grody, the Management Defendants, and the John Doe Defendants, more than $667,000 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

F.      On the Sixth Cause of Action against the Laundering Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $667,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: May 9, 2023

RIVKIN RADLER LLP

By:   _/s/ Michael A. Sirignano_

         Michael A. Sirignano, Esq.
         Barry I. Levy, Esq.
         Jennifer Abreu, Esq.
         Michael Vanunu, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

6975118.v8